FIRSTAR BANK SIOUX CITY,
N.A., Plaintiff,

v.

BEEMER ENTERPRISES, INC., and
Bob Schlickbernd, Defendants,

and

BEEMER ENTERPRISES, INC.,
Third–Party Plaintiff,

v.

FIRSTAR CORPORATION, et al.,
Third–Party Defendants.

No. C 94–4110–MWB.

United States District Court,
N.D. Iowa,
Western Division.

Sept. 17, 1997.

G. Michael Halfenger, argued, Andrew J. Wronski, Foley & Lardner, Milwaukee, WI, for Plaintiff.

Jeffrey A. Silver, Omaha, NE, for Defendants.

**MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S AND THIRD–PARTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................1235

II. LEGAL ANALYSIS ............................................1236
   A. Standards For Summary Judgment ...................1236
   B. Application Of Summary Judgment Standards ......1240
      1. RICO and civil conspiracy claims ...............1240
      2. Breach Of Contract ..............................1242
      3. Fraud and failure to disclose ...................1242

III. CONCLUSION ...............................................1243

The only Phoenix to rise from the ashes of John Morken's "Adventure Cattle" investment scheme is litigation—in a plethora of lawsuits—among the various parties embroiled in the scheme over who should bear what part of the millions of dollars lost in the scheme's conflagration. Morken is bankrupt and has pleaded guilty to bank fraud, and thus cannot make good anyone else's losses. In this particular lawsuit, a bank seeks to recover on a note for a loan to an investor in the scheme, while the investor seeks to tag the plaintiff bank and other third-party defendants with RICO and other liability for their involvement with Morken's scheme. The court considers the various claims on a motion for summary judgment filed by the plaintiff bank and third-party defendants.

The bank and third-party defendants have asserted as a ground for summary judgment on claims against them what many defendants must often think, but never say: The investor's claims simply make no economic sense, and therefore should never reach a jury. Although unusual, such a ground for summary judgment was recognized by the Supreme Court, in the context of antitrust litigation, in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court must therefore consider this "no economic sense" argument, as well as other grounds for summary judgment, in the present ruling.

## I. INTRODUCTION

Plaintiff Firstar Sioux City seeks to collect the principal sum and interest due on a note executed by defendant Beemer and guaranteed by defendant Schlickbernd. Unless the context dictates otherwise, Beemer and Schlickbernd will be referred to collectively as "Beemer." Beemer has responded by filing several counterclaims and a third-party complaint against Firstar Sioux City, other Firstar Banks and Firstar Corporation, and various individuals, all employees or officers of the various Firstar entities. These counterclaims and third-party claims include alleged RICO violations, fraud, negligent breach of fiduciary duty of disclosure, negligent misrepresentation, breach of contract,[1] and civil conspiracy. Beemer seeks a setoff of its damages on these claims against any balance due on its note to Firstar Sioux City.

This matter comes before the court pursuant to the motion for summary judgment on all claims, counterclaims, and third-party claims filed by plaintiff Firstar Sioux City and third-party defendants. Both the movants and the non-movants have filed very lengthy briefs and voluminous exhibits in support of their respective positions, and the court has heard oral arguments.[2] Therefore, this matter is fully submitted.

The court will not attempt here an exhaustive dissertation of the undisputed and disputed facts of the case. Instead, the court will discuss disputed and undisputed facts pertinent to each claim to the extent necessary to resolve the motion for summary judgment on that claim. However, a brief statement of the factual backdrop for the various claims in this action is provided here to place the court's legal analysis in context.

Defendant Bob Schlickbernd executed a promissory note dated May 27, 1994, on behalf of defendant Beemer for $550,000 borrowed from Firstar Sioux City. Schlickbernd also executed a guaranty dated May 27, 1994,

for Beemer's loan from Firstar. It was understood that Beemer would use the proceeds of the loan to invest in John Morken's Adventure Cattle program, and Beemer did in fact invest the loan proceeds in that way. The defendants have admitted the authenticity of the signatures on the note and guaranty. Beemer has allegedly defaulted on the note in the wake of the collapse of the Adventure Cattle investment scheme.

The Adventure Cattle program in which Beemer invested the proceeds of the loan was a cattle-feeding investment scheme run by John Morken involving the purchase and sale of cattle through Spring Grove Livestock Exchange (SGLE), a company Morken also controlled, the feeding of these cattle at various regional feedlots, and the sale of the cattle to packing houses for slaughter. Investors purchased cattle selected by SGLE or Morken and Morken guaranteed investors a 25 % annualized return on their investment when the cattle were sold for slaughter. Morken was to incur any losses on the investment, but was also to enjoy any profits in excess of the return guaranteed to investors.

Beginning in 1992, various Firstar entities provided banking services to Morken and SGLE, including a control disbursement service. The control disbursement service allowed funds to be deposited to an interest-bearing "funding account," with only sufficient transfers out of that account each day to cover checks presented for payment against a "disbursement account," which consequently began and ended each day with an "imprest" balance of $25,000. The "funding account" was at Firstar Milwaukee, while the "disbursement account" was at Firstar Wausau. Morken was allowed to draw against deposited, but uncollected funds in the "funding account" to pay checks drawn on the "disbursement" account. The Firstar entities contend that allowing businesses to draw

---

1. The contract allegedly breached is not the loan agreement, but an investment contract Beemer had with John Morken's "Adventure Cattle" investment scheme. Beemer's theory is that Firstar Sioux City was a "joint-venturer" with Morken in the Adventure Cattle scheme, and is therefore liable for Morken's breach of the investment agreement by failure to pay the promised return.

2. The oral arguments took place on August 25, 1997. Plaintiff Firstar Sioux City and the third-party defendants were represented at the oral arguments by counsel G. Michael Halfenger, who argued the motion, and Andrew J. Wronski of Foley & Lardner in Milwaukee, Wisconsin. Defendants and third-party plaintiffs Beemer and Schlickbernd were represented by counsel Jeffrey A. Silver in Omaha, Nebraska.

upon uncollected funds was a normal banking practice for business accounts and that the control disbursement service was intended to provide a typical cash-management tool. Beemer contends that allowing Morken to draw against uncollected funds in this case was part of the banks' collusion with Morken to operate an enormous check-kiting scheme.

Some "float" among the accounts of the control disbursement service and Morken's accounts necessarily arose from Morken's ability to draw immediately against uncollected funds that were not actually collected until some time later and the further delay between a deposit to the "funding account" at one bank and a corresponding withdrawal from the "disbursement account" at a separate bank. Some "float" is inherent in any control disbursement services, because separate accounts perform the credit and debit functions found in a single ordinary checking account. Beemer contends, however, that the control disbursement service was designed by the Firstar entities in collusion with Morken to provide Morken with almost unlimited credit while generating huge "analysis fees" for the Firstar banks.

It is undisputed that Morken abused the "float" by "kiting" checks.[3] Morken would write checks against uncollected or non-existent funds in his own account, deposit the checks to the SGLE "funding account," then write a check on the SGLE "disbursement account" for a similar or larger amount for deposit in his own account to cover, with uncollected funds, the first check when it was eventually presented for payment against his own account. This process continued on an ever increasing scale. The size of Morken's "kite" grew until, by the time Firstar shut down the control disbursement service and started returning checks drawn against uncollected funds on June 2, 1994, the parties agree that his effective overdraft was approximately $22 million. During the operation of the control disbursement scheme, it is undisputed that the Firstar banks received slightly less than $1 million in "analysis fees" from Morken and SGLE for drawing against uncollected funds and other services to the control disbursement service accounts.

The parties dispute whether an officer of Firstar Sioux City, defendant Young, "solicited" Beemer to participate in the Adventure Cattle scheme or "sold" the scheme to him along with financing for his investment, or whether Beemer had instead already decided to participate in the investment scheme and Firstar only sought its business to finance its investment. At the time Beemer obtained its loan to invest in the Adventure Cattle scheme in the Spring of 1994, defendant Young allegedly told Schlickbernd that Morken was "financially strong." Beemer contends that Young and the Firstar defendants, because they had knowledge of Morken's accounts at Firstar Sioux City and other Firstar banks, should have or did in fact know that Morken's financial situation was not strong, but failed to disclose Morken's true financial status in order to induce Beemer and others like him to inject "good" funds into Morken's accounts. Beemer contends that he relied on Young's representation about Morken's financial strength and Young's "selling" of the Adventure Cattle contracts in deciding to invest in the Adventure Cattle scheme. The Firstar banks and personnel contend that Young only portrayed Morken's financial status as he reasonably understood it to be, was under no obligation to disclose contrary information if the Firstar entities or personnel had had such information, which they contend they did not, and further that Beemer's assertion that it relied on Young's statement is not credible, because Beemer had already decided to invest in the Adventure Cattle scheme when Young made the statement and Beemer had previously invested in or run other cattle feeding operations.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to *Fed.R.Civ.P.* 56 in a number of recent decisions. *See, e.g., Laird v. Stillwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v.*

---

**3.** The dispute among the parties is whether Firstar entities and personnel were ignorant of the "kiting," or whether they instead not only turned

a blind eye to it, but actively encouraged it and designed accounts to make it possible.

*City of Sioux Center,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added).[4]

However, the plaintiff and third-party defendants have drawn the court's particular attention to the non-movant's burden to generate a genuine issue of material fact, meaning facts from which a rational trier of fact could find for the non-moving party, citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Still more specifically, they point to the following language in *Matsushita:*

[I]f the factual context renders [non-movants'] claim implausible—if the claim is one that simply makes no economic sense— [non-movants] must come forward with more persuasive evidence to support their claim than would otherwise be necessary.

*Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. Plaintiff and third-party defendants contend that Beemer's claims against them simply make no economic sense, because no reasonable jury could find that a bank or banks would risk $22 million in potential losses from check kiting in order to reap less than $1 million in fees from the control disbursement service that Beemer asserts made the check kiting possible. Therefore, movants contend, Beemer must come forward with more persuasive evidence to support its claims than would otherwise be necessary, and this, they contend, Beemer has signally failed to do.

In *Matsushita,* the Supreme Court found summary judgment was appropriate, because "as presumably rational businesses, [defendants] had every incentive *not* to engage in the conduct with which they are charged, for its likely effect would be to generate losses for petitioners without corresponding gains." *Id.* at 595, 106 S.Ct. at 1360. The Court found that the court of appeals below in *Matsushita* had failed to consider the absence of a plausible motive to engage in the allegedly illegal conduct, predatory pricing. *Id.* The Court explained,

[T]he absence of a plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if [defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.

*Id.* at 596–97, 106 S.Ct. at 1361–62. Recently, the Supreme Court returned to the "economic sense" theme first sounded in *Matsushita in Eastman Kodak Co. v. Im-*

---

**4.** The movants here, plaintiff Firstar Sioux City and the third-party defendants, are both claimants and defending parties on claims, counterclaims, and third-party claims in this litigation, but they seek summary judgment on all of the claims. Beemer has filed no cross-motion for summary judgment.

*age Technical Servs., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992):

> The Court's requirement in *Matsushita* that the plaintiffs' claims make economic sense *did not introduce a special burden on plaintiffs facing summary judgment* in antitrust cases. The Court did not hold that if the moving party enunciates any economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach a jury, a requirement that was not invented, but merely articulated, in that decision. *If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.*

*Eastman Kodak Co.*, 504 U.S. at 468–69, 112 S.Ct. at 2083 (emphasis added).

Both *Matsushita* and *Eastman Kodak* were antitrust lawsuits, and it is in this context that the Eighth Circuit Court of Appeals has thus far considered the "economic sense" of the plaintiffs claims (or the defendant's alleged conduct) in ruling on motions for summary judgment. *See Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1495 (8th Cir. 1992) (quoting both *Matsushita* and *Kodak*, and finding that a claim alleging antitrust violations caused the collapse of the plaintiffs business was not plausible in light of the evidence), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993); *H.J., Inc. v. International Tel. & Tel. Corp.*, 867 F.2d 1531, 1544 n. 10 (8th Cir.1989) (considering a claim of conspiracy in restraint of trade, the court rejected the defendant's assertion that *Matsushita* required the plaintiff to prove that the defendant had a rational economic motive to conspire and that the defendant's conduct is not consistent with other, equally probable explanations, because *Matsushita's* discussion of rational economic motives is inapplicable where there are no assertions that the defendant's conduct makes no economic sense, and the conspiracy in question could and did benefit the defendant); *Assam Drug Co., Inc. v. Miller Brewing Co., Inc.*, 798 F.2d 311, 317 (8th Cir.1986) (noting that *Matsushita* found "economic realities" were relevant to summary judgment motions in antitrust cases, and concluding that an antitrust claim would make no economic sense where the defendant lacked market power). However, other circuit courts of appeals have considered the impact of economic implausibility of claims in a variety of contexts. *See, e.g., R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 58 (2d Cir.1997) (suit by a real estate broker against a developer for unpaid commissions); *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir.1997) (observing that "[a] little common sense is not amiss in a discrimination case," citing *Matsushita*, and considering the implausibility of the assertion that any American would think that all Americans are stupid as weighing against the plaintiff's claim of anti-American bias by an American employee of a Japanese company); *United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995) (considering the "implausibility" of claims in a *qui tam* action), *cert. denied*, —— U.S. ——, 116 S.Ct. 700, 133 L.Ed.2d 657 (1996); *NLFC, Inc. v. Devcom Mid–America, Inc.*, 45 F.3d 231, 235 (7th Cir.1995) (considering economic implausibility as undercutting copyright infringement claims), *cert. denied*, 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); *Bator v. Hawaii*, 39 F.3d 1021, 1026 (9th Cir.1994) (holding, in a § 1983 employment discrimination suit, that the plaintiff's claims were not so implausible as to require her to come forward with additional evidence, particularly where some part of her story was corroborated).

This court concludes that the "economic sense" of Beemer's claims is relevant to the disposition of the summary judgment motion, even though no antitrust claims are asserted in this litigation. Indeed, this court finds that the "economic sense" of the claims is particularly relevant where all claims arise in a commercial context, such as is presented in this case. *Compare Lam v. University of Hawaii*, 40 F.3d 1551, 1563 (9th Cir.1994) (noting that economic implausibility is not as persuasive in employment discrimination cases, because "[a]ntidiscrimination laws are not predicated upon the existence of economically 'rational' discrimination; the problem that exists and which such laws target is, to a large extent, stubborn but irrational prejudice.").

Although this court concludes that economic implausibility of claims is relevant to summary judgment in contexts other than antitrust litigation, the court finds that the precise effect of economic implausibility of a claim at the summary judgment stage of the proceedings is not altogether settled. The Ninth Circuit Court of Appeals appears to read *Matsushita* as imposing a heightened burden of production and persuasion on a non-movant asserting an implausible claim:

> If the facts make a claim "implausible," the non-movant must present "more persuasive evidence than would otherwise be necessary" in order to defeat a summary judgment motion. Although the evidence must be viewed in a light most favorable to the opponent of the motion, and all reasonable inferences must be drawn in his favor, the inferences are limited to those upon which a reasonable jury might return a verdict.

*Northern Telecom, Inc.*, 52 F.3d at 815 (emphasis added). The *Matsushita* decision may have suggested such a heightened burden upon the proponent of an economically implausible claim by stating that when a claim is implausible, the non-movant "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. However, the Supreme Court has since explained that *Matsushita* did not impose any special burden on a party resisting summary judgment on "implausible" claims, but merely articulated the requirement that the non-moving party's inferences be reasonable in light of all of the evidence. *Eastman Kodak Co.*, 504 U.S. at 468–69, 112 S.Ct. at 2082–83. This is the reading of *Matsushita* embraced by the Eighth Circuit Court of Appeals. *See Amerinet, Inc.*, 972 F.2d at 1495 (quoting *Eastman Kodak*).

Similarly, the Second Circuit Court of Appeals has expressly cautioned that "*Matsushita* does not ... establish a 'threshold' question of 'plausibility' and then subject 'implausible' claims to a 'heightened' test." *R.B. Ventures, Ltd.*, 112 F.3d at 58. The Second Circuit Court of Appeals explained the impact of implausibility on the summary judgment analysis:

> *Matsushita* reinforces the notion, central to summary judgment jurisprudence, that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" [*Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.]
>
> Properly understood, *Matsushita* stands merely for the unexceptional proposition that it is the *factual and legal context* within which a party presents evidence that determines what are the *reasonable* inferences to be drawn from that evidence. The opponent of a summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts," and although the court must draw the inferences in favor of the non-moving party, the permissible inferences are ultimately limited by the relevant substantive law....
>
> Accordingly, even where the surrounding circumstances indicate what has been termed, perhaps unfortunately, "implausibility," at the summary judgment stage, the court should not "weigh" the evidence in the same manner as a trier of fact.... *Matushita* authorizes only an inquiry on summary judgment into the "implausibility" of inferences from circumstantial evidence, ... not an inquiry into the credibility of direct evidence. At summary judgment, the court must still construe the reasonable inferences in favor of the non-moving party. In evaluating the sufficiency of the non-moving party's evidence, courts must still proceed very cautiously, even in the face of "implausible" claims.

*R.B. Ventures, Ltd.*, 112 F.3d at 58–59 (citations and internal quotations omitted). *Accord NLFC, Inc.*, 45 F.3d at 235 (the inferences asserted by the non-movant "must be 'reasonable in light of the competing inferences,'" quoting *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356); *Lam*, 40 F.3d at 1563 (also emphasizing that *Matsushita's* economic sense rule only applies to the inferences to be drawn from circumstantial evidence). In light of these precedents this court concludes that the "implausibility" of the non-movant's claims does not heighten the burden upon the non-movant; rather, the implausibility of

inferences the non-movant requires to succeed on its claims must be considered in light of the summary judgment record as a whole.

Furthermore, this court reads a recent decision of the Eighth Circuit Court of Appeals, *Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir.1997), as demonstrating the difference between the implausibility of inferences from the non-movant's evidence and the *plausibility* of the movant's theory. Although the Eighth Circuit Court of Appeals did not mention *Matsushita* in the pertinent part of the *Handeen* decision, in reversing summary judgment in favor of defendants on RICO claims, the court cautioned that " 'a party moving for summary judgment is not entitled to a judgment merely because the facts he offers appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial.' " *Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir.1997) (quoting 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, at 104–05). This court reads *Handeen* in conjunction with *Matsushita* to require something more than the greater plausibility of the movants' evidence to establish entitlement to summary judgment: The non-movant's theory must be *implausible*, not just *less plausible* than the movant's, in light of the record as a whole before the movant is entitled to summary judgment.[5]

With these standards in mind, the court turns to analysis of Beemer's counterclaims and third-party claims, beginning with the RICO and civil conspiracy claims, then turning to the breach of contract and fraud claims. Firstar Sioux City's claim, although it is the principal claim of the action, will be considered last, because a genuine issue of material fact on any of Beemer's claims means that there is a genuine issue of material fact on a defense to Firstar Sioux City's claim for collection of the note, precluding summary judgment on the bank's claim as well.

### B. Application Of Summary Judgment Standards

The court finds that the plaintiff and third-party defendants have made an extremely persuasive presentation of their case, including persuasive explanations of conflicting evidence, in support of their motion for summary judgment. Were the undersigned the trier of fact in this case, he would not hesitate to find for the plaintiff and third-party defendants on each of the claims asserted in this litigation. However, the trial judge's function at the summary judgment stage of the proceedings, applying traditional standards, is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). Although the court certainly finds that the plaintiff and third-party defendants have asserted *more plausible* inferences from the record as a whole, that showing alone is not sufficient to entitle them to summary judgment. *Handeen*, 112 F.3d at 1354. The reasons the court cannot find the defendants' inferences so entirely *implausible*, in light of the record as a whole, as to justify summary judgment in favor of plaintiffs and third-party plaintiffs, *cf. Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57, are discussed below.

### 1. RICO and civil conspiracy claims

There is no *direct* evidence of collaboration, conspiracy, or association in fact among Morken and the third-party defendants; indeed, Morken himself, in pleading guilty to bank fraud, acknowledged that he had defrauded the banks, not conspired with them. Thus, Beemer's RICO and civil conspiracy claims depend entirely on the inferences from circumstantial evidence, *see R.B. Ventures, Ltd.*, 112 F.3d at 59 ("*Matsushita* authorizes only an inquiry on summary judgment into the "implausibility" of inferences from circumstantial evidence ... not an inquiry into the credibility of direct evidence.");

---

**5.** However, the court does not read *Handeen*, as Beemer appeared to suggest at oral arguments, for the proposition that the Eighth Circuit Court of Appeals rejects implausibility as a ground for summary judgment. Such a reading of *Handeen* would make that decision clearly contrary to *Matsushita* and *Eastman Kodak*.

*Lam,* 40 F.3d at 1563 (*Matsushita's* economic sense rule only applies to the inferences to be drawn from circumstantial evidence), and the plaintiff and third-party defendants have specifically asserted the economic implausibility of those inferences. *Compare H.J., Inc.,* 867 F.2d at 1544 n. 10 (*Matsushita's* additional evidence rule is inapplicable where there are no assertions that the defendant's conduct makes no economic sense). Therefore, consideration of the "economic sense" of Beemer's claims pursuant to *Matsushita* is appropriate in this case.

Beemer's case depends entirely on inferences from the existence of the check kiting as suggesting that the plaintiff and third-party defendants "must have" known of the kiting, and not only that, but fostered, encouraged, and colluded in the kiting. Such inferences seem implausible on their face— they make no economic sense—because no rational bank would tolerate a potential loss from a $22 million check-kiting scheme, let alone set up bank accounts with the intent that such check-kiting occur, just to generate about $1 million in "analysis fees." As the Eighth Circuit Court of Appeals has recently explained,

> The ability to write checks against provisional credits gives the shrewd bank customer free use of someone else's money. Viewed charitably, this is called aggressive cash management. It also gives the dishonest customer a chance to write checks against non-existent deposits. When done systematically and fraudulently, prosecutors call this criminal check kiting. *See Williams v. United States,* 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 3089 n. 1, 73 L.Ed.2d 767 (1982). By whatever name it is called, *when done with large amounts of money, it exposes banks to large losses, and they do not willingly tolerate the practice.*

*Laws v. United Missouri Bank of Kansas City, N.A.,* 98 F.3d 1047, 1048 (8th Cir.1996) (emphasis added), *cert. denied,* —— U.S. ——, 117 S.Ct. 1432, 137 L.Ed.2d 540 (1997). The court also recognizes that check-kiting is notoriously difficult to detect, particularly when the kite is between accounts at different banks; furthermore, even when a kite is suspected, there may be a number of reasons banks move slowly to accuse an account holder of kiting. *See First Nat'l Bank in Harvey v. Colonial Bank,* 898 F.Supp. 1220, 1223 (N.D.Ill.1995) (describing the difficulties in determining whether a customer is kiting or engaging in a legitimate movement of funds, and noting that banks may be reluctant to take any action on a suspected kite for fear of liability to a customer for wrongful dishonor of checks or defamation, or for fear of angering a large customer, if no kiting is in fact occurring).

However, in light of the entire record, *see Matsushita,* 475 U.S. at 587–88, 106 S.Ct. at 1356–57 (directing that the reasonableness of inferences be determined from the entire factual context), reasonable inferences arise that the banks here were too willing to accept Morken's explanations, or, put less charitably, were "asleep at the wheel." Indeed, reasonable inferences undercutting the implausibility of the defendants' claims go further still. There are reasonable inferences of off-setting gains, or reasonably perceived off-setting gains, to the Firstar banks sufficient to induce them to bear the substantial risk of losses from Morken's check kiting. *See Matsushita,* 475 U.S. at 595, 106 S.Ct. at 1360 (considering whether the "likely effect [of the conduct alleged] would be to generate losses for [the movants] without corresponding gains."); *H.J., Inc.,* 867 F.2d at 1544 n. 10 (*Matsushita's* discussion of rational economic motives is inapplicable where the conspiracy in question could and did benefit the defendant). Certainly, the banks *did* benefit from Morken's check-kiting, because they did obtain analysis fees. Furthermore, the record is replete with evidence that Firstar officers could have and should have recognized the kite, but for one reason or another were persuaded to take no action, giving rise to a reasonable inference that they simply preferred to reap the benefits of the kite, while actively encouraging it, colluding in it, or tolerating it, in the belief that the kite would deflate itself with a sufficient injection of "good" funds.

The banks' contrary inferences also seem to depend somewhat on the benefits of hindsight: they assume that the banks were aware of precisely the size and scope of the kite versus the amount of fees generated by the kite, and therefore were able to and did

make a moment-to-moment cost-benefit analysis to justify continued participation in the kite. However, in Beemer's favor, willful blindness while enjoying the benefits of the fee income is also a reasonable inference from the evidence.

Therefore, the court concludes that Beemer's claims of collusion by the banks and bank personnel in Morken's kiting are not so implausible as to entitle the plaintiff and third-party defendants to summary judgment. *Compare Matsushita,* 475 U.S. at 587–88, 106 S.Ct. at 1356–57 (concluding that claims were so implausible as to entitle the movant to summary judgment). Rather, reasonable inferences of collusion generate genuine issues of material fact on this claim.

Once a genuine issue of material fact is recognized as to collusion in Morken's check-kiting, it is readily apparent that this genuine issue of material fact colors or gives rise to genuine issues of material fact as to the remaining elements of Beemer's RICO claims. To establish a RICO violation under 18 U.S.C. § 1962(c) a plaintiff must demonstrate "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" that must include at least two racketeering acts. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *United States v. Nabors,* 45 F.3d 238, 239 (8th Cir.1995) (quoting *Sedima* for the elements of the violation in a criminal RICO prosecution). A reasonable inference of collusion in the check-kiting gives rise to the inference that the plaintiff and third-party defendants were conducting the Adventure Cattle check-kiting enterprise through the pattern of Morken's frauds. Similarly, genuine issues of material fact are generated on the comparable and additional elements of Beemer's other RICO claims and civil conspiracy claims.

Therefore, summary judgment cannot be granted in favor of the plaintiff and third-party defendants on Beemer's RICO and civil conspiracy claims.

### 2. Breach Of Contract

■ In *Thomas v. Hansen,* 524 N.W.2d 145 (Iowa 1994), the Iowa Supreme Court identified the necessary showings for "joint venturer" liability on a contract to which the alleged "joint venturer" was not a named

party. The Iowa Supreme Court noted that there are five "usual indicia" of a joint venturer relationship, but that "each of the five need not necessarily appear." *Thomas,* 524 N.W.2d at 146. The five "usual indicia" are the following:

(1) a common undertaking;

(2) a joint proprietary interest in the subject matter;

(3) a mutual right to control;

(4) a right to share in the profits; and

(5) a duty to share the losses.

*Id.* (citing *Farm–Fuel Prods. Corp. v. Grain Processing Corp.,* 429 N.W.2d 153, 156 (Iowa 1988), and finding a joint venture, because of acknowledgments of joint control and coverage of one joint venturer's employees under the other joint venturer's workers compensation insurance). There are, however, no "very fixed or certain boundary" of what constitutes a joint venture. *Farm–Fuel Prods.,* 429 N.W.2d at 156.

■ For much the same reason the court finds genuine issues of material fact on conduct or participation in the RICO enterprises, the court finds a genuine issue of material fact as to whether the plaintiff and third-party defendants engaged in a common undertaking with Morken, and hence a joint proprietary interest in the subject matter and a mutual right to control, sufficient to preclude summary judgment on Beemer's joint-venturer breach-of-contract claim. Because it is unnecessary to establish each of the five indicia of a joint venture, *see Thomas,* 524 N.W.2d at 146 (each of the five indicia need not necessarily appear), it is unnecessary to look further for genuine issues of material fact precluding summary judgment on this claim. Again, the court's doubts about Beemer's likelihood of prevailing on this claim at trial are not relevant to its disposition of the motion for summary judgment on this claim. *See Handeen,* 112 F.3d at 1354.

### 3. Fraud and failure to disclose

Beemer's remaining claims, fraud, negligent misrepresentation, and breach of fiduciary duty of disclosure, all depend upon Young's alleged misrepresentation of Mork-

en's financial strength. The court finds that these claims arise from a "self-contained" universe of facts that has no necessary impact on or relation to Beemer's RICO and conspiracy claims, largely because "control" of the Adventure Cattle program by Firstar entities is irrelevant to these claims, and the facts involved relate directly to the loan agreement that is principally at issue. The benefits to Young and Firstar from inducing Beemer to take out a loan from Firstar Sioux City were direct and immediate. Thus, no taint of implausibility of the other claims, if the court had been persuaded it existed, would stain these claims.

Were the undersigned the trier of fact in this case, he would not hesitate to find for the plaintiff and third-party defendants on each of these claims either. However, once again, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick,* 90 F.3d at 1376–77; *Johnson,* 906 F.2d at 1237. Upon hearing the arguments of the parties and careful perusal of the record, the court finds that the following genuine issues of material fact preclude summary judgment on these claims: (1) whether the statement was in fact made; (2) whether Young or Firstar entities knew or reasonably should have known the statement was untrue based on information about Morken's financial status reasonably available to them; (3) whether the relationship of the parties was such as to give rise to a duty of disclosure or other fiduciary duty; (4) the extent to which Young or Firstar disclosed information and the concomitant question of the extent to which a duty of further disclosure was thereby assumed; (5) whether and to what extent Young and Firstar were "in the business" of providing information about investments as part of the product of loaning money for investments; and (6) the extent to which Beemer relied upon any misrepresentations.

The plaintiff and third-party defendants' motion for summary judgment on Beemer's claims and on the plaintiff's own claim for payment of the note, to which Beemer's claims provide a set-off or defense, will therefore be denied.

### III. CONCLUSION

The court concludes that Beemer's RICO and civil conspiracy claims in this litigation are not so implausible as to justify summary judgment in favor of the plaintiff and third-party defendants. Instead, although the court would conclude otherwise were it the trier of fact, the court finds just barely reasonable inferences from the record as a whole that generate genuine issues of material fact for trial. Similarly, genuine issues of material fact preclude summary judgment on Beemer's joint-venturer breach-of-contract, fraud, and fiduciary duty claims.

Plaintiff and third-party defendants' motion for summary judgment is therefore **denied** in its entirety.

**IT IS SO ORDERED.**