### Laura POLLOCK,
#### Plaintiff/Appellant/Cross–Respondent,

v.

### WETTERAU FOOD DISTRIBUTION GROUP, Defendant/Respondent/Cross–Appellant.

#### Nos. ED 74309, ED 74344.

Missouri Court of Appeals,
Eastern District,
Division Three.

Dec. 14, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 7 and March 2, 2000.

Application for Transfer Denied March 21, 2000.

the trial court erred in: 1) barring her from recovering back pay and benefits after the date on which she rejected Defendant's offer of reinstatement; 2) denying her prejudgment interest; 3) dismissing her claim for damages for emotional distress as preempted by the Workers' Compensation Law, Section 287.010, et seq.; 4) barring her from recovering attorneys' fees after the date on which she rejected Defendant's offer of reinstatement; and 5) taxing one-half of the filing fee and deposition costs to each Plaintiff and Defendant. Defendant cross-appeals, arguing that the trial court erred in: 1) considering time-barred allegations in finding that Plaintiff suffered a hostile work environment; 2) finding that Plaintiff was constructively discharged; 3) refusing to find that Plaintiff was estopped from asserting a claim for sexual harassment because she did not complain to Defendant prior to her resignation and refused to cooperate in the investigation; 4) holding Defendant strictly liable on Plaintiff's sexual harassment claim pursuant to a state regulation; and 5) awarding Plaintiff any attorneys' fees as her attorney had been disbarred by the time of the award of attorneys' fees. The parties have also filed various motions with this Court that have been taken with the case. We affirm in part, and reverse and remand in part.

John Douglas Lynn, St. Louis, for appellant.

Kevin James Lorenz, William B. Jones, Robert W. Stewart, St. Louis, for respondent.

MOONEY, Judge.

Laura Pollock ("Plaintiff") appeals from the judgment entered on her claim under the Missouri Human Rights Act ("MHRA"), Section 213.010, et seq., RSMo. (1994),[1] against her former employer, Wetterau Food Distribution Group ("Defendant"). On appeal, Plaintiff argues that

## FACTS

The facts viewed in the light most favorable to the trial court's judgment, *Champion v. Frazier*, 977 S.W.2d 61, 62 (Mo.App. E.D.1998), are as follows:

In July 1984, Plaintiff, who was 20 years old at the time, began working as a part-time order filler in Defendant's grocery warehouse. She obtained a full-time position a few months later. About four months after she began working for Defendant, Plaintiff became aware that Jack Driskill ("Driskill"), the manager of the warehouse, had a sexual interest in her

---

1. All statutory references herein are to RSMo. (1994), unless otherwise noted.

when he commented that she had a "sexy body," and told her that he wanted to go out with her. Plaintiff told Driskill that she would not go out with him, because he was her supervisor. Ignoring her rejection, Driskill continued to repeatedly pressure Plaintiff to go out with him. Each time, Plaintiff rebuffed his advances.

Driskill also began to follow Plaintiff around the warehouse. He would stand at the end of an aisle in the warehouse and watch Plaintiff while she worked. If she moved to another aisle, he would follow her. Sometimes he stood behind her, smoking a cigarette and staring at her.

Driskill gave Plaintiff numerous cards and letters in which he expressed his romantic feelings for her. The first time Plaintiff recalls receiving a written communication from Driskill, he handed her a piece of paper with his home telephone number on it and told her to call him for a drink. She refused. He gave some of these love notes to Plaintiff at work; others were mailed to Plaintiff's home. The cards and letters upset her. She was frustrated that Driskill would not leave her alone when she had repeatedly told him that she did not want anything to do with him.

Driskill also telephoned Plaintiff at home. At the time, she was living with her mother. Plaintiff told her mother that she did not want to speak with Driskill and instructed her mother to tell Driskill she was not home when he called. He sent flowers to Plaintiff's home and told her mother he was in love with Plaintiff. Driskill appeared at Plaintiff's home several times, despite the fact that he had never been invited nor told where she lived. On one occasion, Driskill stopped and spoke to Plaintiff, other times he would just drive by the house or would park his car on the street in front of the house.

This pattern of sexual harassment continued from the fall of 1984 until February 1986 when Plaintiff suffered an on-the-job injury to her wrist. Due to her injury, she was unable to work from February 5, 1986, to July 5, 1988. In the beginning of Plaintiff's period of absence from work, Driskill continued to send Plaintiff cards and telephone her, but eventually all contact between the two ceased. She recovered from her injury and returned to work at the warehouse in July 1988.

Following her return to work, Driskill began a new round of harassment that was more intense and frequent. Driskill now acted rejected and angry toward Plaintiff. On an almost daily basis, Driskill followed Plaintiff around the warehouse and stared at her, which upset Plaintiff. Several of Plaintiff's co-workers confirmed Driskill's stalking of Plaintiff at work.

Driskill resumed his telephone calls to Plaintiff at home. Plaintiff asked Driskill to stop calling her to no avail. Driskill also continued his onslaught of cards and letters. Again, Driskill sent some of the notes to Plaintiff's home and delivered others to her at work. Plaintiff now lived in her own apartment, and Driskill would park in the parking lot of Plaintiff's apartment complex to watch her comings and goings.

One evening, Driskill appeared at Plaintiff's door and pushed his way into her apartment. He had difficulty walking, slurred his words and had a bottle of Jack Daniels tucked in his pocket. Plaintiff told him to leave, but he refused. He was loud and called Plaintiff a "fucking bitch." He yelled, "…you don't know what you want… [b]ut I know what I want… I want to fuck your brains out." After Plaintiff repeatedly threatened to call the police, Driskill finally left.

Another night, Plaintiff received numerous unwanted phone calls from Driskill. Driskill slurred his words and rambled incoherently during the phone calls. She described his tone as belligerent, angry and scary. Frightened and worried that Driskill would make a return visit to her apartment, Plaintiff called Rick Seaman ("Seaman"), a male co-worker, to get advice on the situation. Seaman stated that

Plaintiff was crying, frightened and upset during the telephone call. Plaintiff told Seaman that she did not want to report Driskill to management, because she was frightened for her job. Seaman called Driskill and told him to leave Plaintiff alone. According to Seaman, Driskill became argumentative, so Seaman ended the call abruptly.

When Plaintiff arrived at work the next morning, Driskill was waiting in the parking lot kicking around a paper cup. As Plaintiff walked by him to go to work, Driskill hollered, "You slut." When Seaman arrived at work, he also saw Driskill kicking the cup around in the parking lot. Seaman believed that Driskill wanted to pick a fight with him, so he waited in the car for awhile to collect himself. Once in the warehouse, Driskill watched Seaman's every move. That morning, Driskill found Plaintiff and Seaman speaking to each other and angrily informed them that if he caught the two of them talking again, "it will be your ass." Later that day, Driskill informed Plaintiff, "If you're going to have somebody fight your battles, he'd better be bigger than Rick."

Driskill began to use his authority as warehouse manager to keep Plaintiff separated from other male employees, especially Seaman. Driskill enlisted the help of several line supervisors to keep Plaintiff away from male co-workers. Driskill also used the supervisors to help keep track of Plaintiff. Plaintiff assumed that Driskill instructed these supervisors to inform him whenever she called in sick, because as soon as she would do so, Driskill would immediately phone her at home, asking why she was absent from work and whether she had a date or if someone was there with her.

Zeke Davis ("Davis"), the chief union shop steward, also aided Driskill's pursuit of Plaintiff. When Plaintiff told Davis that Driskill was harassing her, he laughed and told her to give Driskill a chance because he was "a nice guy." One time, Davis relayed an invitation from Driskill to Plaintiff to leave work and meet him at a bar and that if she did so, Driskill would "take care of her time card." She refused.

Driskill's harassment of Plaintiff continued until the day of her resignation. On June 5, 1989, Plaintiff decided she could no longer cope with the harassment and resigned. She met with the company's personnel director, Helen Felts ("Felts"), before leaving that day. Felts asked Plaintiff why she was resigning, and Plaintiff initially told her that the warehouse was "no place for a woman" and that she was going back to school. However, Felts pressed for an explanation and asked, "Is it Jack Driskill?" Plaintiff then outlined Driskill's sexual harassment of her over the years. She told Felts she did not want to get Driskill in trouble by filing a complaint against him for fear of retaliation by Driskill. Plaintiff admits that this was the first time she officially reported Driskill's harassment to Defendant.

Although Defendant appears to have had a sexual harassment policy in place during Plaintiff's tenure at the warehouse, many employees who testified at trial, including Plaintiff, stated that they were unaware of it and never saw the policy posted on the company bulletin board.

Following her resignation, Plaintiff had several meetings with Dennis Duker ("Duker"), an attorney who served as Defendant's Director of Labor Relations. During the first meeting, Duker asked Plaintiff if she wanted Defendant to investigate her allegations of harassment against Driskill. Plaintiff stated that she did not, because she was afraid that Driskill would discover she was involved and retaliate against her. The next time Plaintiff met with Duker, Plaintiff advised Duker that Driskill was using drugs and alcohol at work. Driskill was well known to have violated the company rule against the use of alcohol and illegal drugs at work. Several employees of the warehouse, including Plaintiff, testified that they witnessed Driskill drinking alcohol or smok-

ing marijuana on the premises during work hours on more than one occasion. Defendant subsequently fired Driskill for failing a drug test.

After Driskill was fired, Duker called Plaintiff to offer her reinstatement to her former position at the warehouse. Plaintiff testified that Duker orally offered her "$10,000.00 cash or my job back if I would sign a release." Plaintiff interpreted this to mean that the offer of reinstatement was conditioned upon her signing a release of all claims against Defendant. Duker testified that he made Plaintiff two offers: "One was $10,000, provide (sic) she signed a release which would sever her employment relation with [Defendant], or number two, an unconditional offer of reinstatement without loss of seniority." In any event, Plaintiff refused the offer of reinstatement, explaining that she felt she could not return to the warehouse even though Driskill was gone because his friends remained. She was worried that Driskill's friends would inform him that she had returned to work at the warehouse and the harassment would begin anew.

Plaintiff timely filed a Charge of Discrimination with the Missouri Commission on Human Rights ("MCHR") alleging that Driskill's sexual harassment created a hostile work environment and caused her to involuntarily resign from her position with Defendant. The MCHR issued Plaintiff a Notice of Right to Sue. Plaintiff filed this lawsuit against Defendant on August 17, 1990, claiming violations of the MHRA based on hostile environment sexual harassment and constructive discharge. As relief, Plaintiff sought damages for emotional distress, as well as other actual, compensatory and punitive damages, and attorneys' fees, costs and interest. On December 16, 1993, the trial court sustained Defendant's Motion to Strike Plaintiff's claim for emotional distress damages on the ground that such claim was preempted by the Workers' Compensation Law.

Following a three-day bench trial in January 1996, the trial court concluded that Defendant was liable to Plaintiff for hostile environment sexual harassment and constructive discharge. The court held that even though Plaintiff had not reported the harassment to management until the day of her resignation, Defendant was liable either because the MHRA imposes a system of strict liability or because the harassment was pervasive enough that Defendant knew or should have known of the harassment. The trial court also found that Defendant failed to have in effect a sexual harassment policy that was made known to its employees. It found that Defendant failed to post notice of the policy where it could readily be seen by employees, the policy had no guarantees against retaliation, Defendant hosted no training programs about sexual harassment and did nothing to give employees reason to believe the policy would be enforced.

The trial court awarded Plaintiff back pay, but limited the amount to the period from the date of Plaintiff's resignation to the date on which she rejected Defendant's offer of reinstatement. The trial court held that the offer of reinstatement was unconditional and that Plaintiff unreasonably rejected the offer. Further, the trial court refused to award punitive damages or prejudgment interest on the award. Both Plaintiff and Defendant have timely appealed this judgment.

## ANALYSIS

■ As this case was bench-tried, we must affirm the judgment of the trial court unless there is no evidence to support the judgment, the judgment is clearly against the weight of the evidence, or the judgment erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). In deciding this case brought under the MHRA, we are guided not only by Missouri law, but also by applicable federal employment discrimination decisions. *Cook v. Atoma Intern. of*

*America, Inc.*, 930 S.W.2d 43, 45 (Mo.App. E.D.1996).

We initially address Defendant's first four points on appeal as they relate to Defendant's liability in this case. Next, we consider Plaintiff's claims of error which primarily challenge the relief awarded by the trial court. Finally, we address the parties' contentions with respect to attorneys' fees and costs.

## I. DEFENDANT'S APPEAL

### A. Continuing Violation Theory

■ In its first point of error, Defendant disputes the trial court's finding of liability on Plaintiff's sexual harassment claim, arguing initially that the trial court erroneously considered time-barred allegations of harassment in support of this finding.

■ A victim of discrimination asserting claims based on the MHRA must file an administrative charge with the MCHR within one hundred and eighty (180) days of the discriminatory act and must bring a civil action no later than two years after the alleged cause occurred. Sections 213.075.1 and 213.111.1. Any act of discrimination occurring outside this 180–day period is considered "merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 557, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). However, the requirements for timely filing are subject to the principles of waiver, estoppel and equitable tolling. *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3rd Cir. 1995).

■ One such equitable exception is the continuing violation theory, under which a victim of discrimination may pursue a claim for an act occurring prior to the statutory period, if she can demonstrate the act is part of an ongoing practice or pattern of discrimination by her employer. *Id.* A plaintiff must establish two things to take advantage of the con-

tinuing violation theory. *Id.* First, she must demonstrate that at least one act occurred within the filing period. *Id.* Further, she must establish that the harassment is a series of interrelated events, rather than isolated or sporadic acts of intentional discrimination. *Id.* at 755. Once the plaintiff has alleged sufficient facts to support the use of the continuing violation theory, the 180–day filing period becomes irrelevant. She may then offer evidence of the entire continuing violation. *Id.*

Defendant argues that Plaintiff failed to establish a continuing violation in this case, and that therefore the trial court improperly considered events occurring 180 days prior to the filing of the Charge of Discrimination on May 16, 1989. We disagree.

There is no question that Plaintiff established a continuing violation in this case. "As in most claims of hostile work environment harassment, the discriminatory acts were not always of a nature that could be identified individually as significant events; instead, the day-to-day harassment was primarily significant, both as a legal and as a practical matter, in its cumulative effect." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir.1998). Driskill subjected Plaintiff to the same forms of harassment physical stalking, notes and telephone calls on a regular basis. Thus, as Plaintiff's claim is based upon a series of closely-related, similar events that occurred within the same general time period and stemmed from the same source, it is in the nature of a continuing violation.

■ Again, Plaintiff must also prove that the violation continued into the limitations period. *Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 579 (8th Cir.1999). Defendant argues that the only incidents of harassment alleged by Plaintiff within the 180–day period were too vague to constitute an actionable hostile environment in that she merely stated that the stalking and harassing telephone calls and notes continued up until the date of her resigna-

tion. We disagree. If there is sufficient evidence that a perpetrator committed very similar acts of harassment on a daily basis, Plaintiff's claim should not fail for lack of specific details about each incident. *Torres v. Pisano*, 116 F.3d 625, 631 (2 nd Cir.1997); *Dey v. Colt. Const. & Dev. Co.*, 28 F.3d 1446, 1456 (7 th Cir.1994). Plaintiff's testimony that Driskill's harassment continued unabated until the day of her resignation sufficiently demonstrated that the violation continued into the statutory period.

Defendant also contends the trial court erroneously considered evidence of harassment occurring outside the workplace in its finding of liability on Plaintiff's sexual harassment claim. However, the fact that some of the incidents occurred outside of the workplace does not relieve Defendant of liability. Defendant cites one case, *Candelore v. Clark County*, 975 F.2d 588 (9 th Cir.1992), for the proposition that incidents occurring outside the workplace are not actionable harassment. However, nowhere does the *Candelore* court state that conduct occurring outside of work can never be actionable.

■ To the contrary, courts frequently consider incidents occurring outside the workplace in determining whether the work situation was intolerable. *E.g., Meritor Savings Bank v. Vinson*, 477 U.S. 57, 60, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (harasser made repeated demands for sexual favors both during and after business hours); *Bales v. Wal–Mart Stores, Inc.*, 143 F.3d 1103, 1106, 1108 (8 th Cir.1998) (actionable sexual harassment included calling plaintiff at home, and engaging in stalking behavior such as driving by her house); *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1525–1528 (9 th Cir.1995) (harasser not only stalked plaintiff at work but also away from work by calling her at home, writing her at home and following her home). In fact, a person is more likely to be intimidated and frightened by harassing behavior occurring at work, if she is also being subjected to the same sort of behavior at home. *Dey*, 28 F.3d at 1455. Therefore, it was entirely appropriate for the trial court to consider acts of harassment that occurred outside the workplace in analyzing Plaintiff's claim for acts that occurred at work.

■ Finally, Defendant claims the trial court erred in considering any allegations of harassment from Plaintiff's first period of employment, because the break in employment cut off the continuing violation. We disagree. Although the break in employment may have cut off Defendant's liability for the continuing violation, evidence of harassment occurring during Plaintiff's first period of employment would still be admissible as background evidence relevant to the question of whether Plaintiff's work environment during her second period of employment was intolerable. *West v. Philadelphia Elec. Co.*, 45 F.3d at 754.

Thus, the trial court did not err in finding a continuing violation in this case. Point denied.

## B. Constructive Discharge

■ Next, Defendant argues that Plaintiff cannot claim she was constructively discharged because she jumped to the conclusion that Defendant would not take action to stop Driskill's harassment and because she quit without giving Defendant an opportunity to remedy the situation. In support of this argument, Defendant relies heavily upon the fact that Plaintiff failed to complain of Driskill's harassment to management prior to her resignation.

■ An employer constructively discharges an employee when the employer "deliberately renders the employee's working conditions intolerable and thus forces [her] to quit [her] job." *Bell v. Dynamite Foods*, 969 S.W.2d 847, 853 (Mo. App. E.D.1998). The determination of whether an employee has been constructively discharged turns on whether "a reasonable person would find his working conditions intolerable." *Id.*

To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly. *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir.1996). It has been stated that an employee who quits without giving her employer a reasonable chance to work out a problem has not been constructively discharged. *E.g., Bell, supra.* However, we do not interpret this to mean that a complaint of harassment is a necessary precondition to a claim of constructive discharge or, conversely, that the plaintiff's failure to complain is an absolute bar to recovery for constructive discharge. Rather, as Judge Posner stated in *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir.1998), the significance of such passivity is that it is inconsistent with an allegation of intolerable working conditions. The fact that an employee fails to complain of alleged harassment may show that her working conditions were in fact tolerable. For this reason, an employee's failure to complain may well be fatal to a claim of constructive discharge in some, but not all, cases. In other cases, an employee's failure to complain may be indicative of factors other than the tolerability of her working conditions. Thus, in determining whether a plaintiff's working conditions were intolerable, which is the essential question in constructive discharge cases, courts should consider the totality of the circumstances, not merely the fact that plaintiff failed to complain of harassment. *See also, Woodward v. City of Worland*, 977 F.2d 1392, 1402 (10th Cir.1992) ("There may certainly be situations where lodging a complaint with a supervisor would be perceived by a reasonable person to be a clearly futile act...")

Here, the trial court found that Plaintiff faced working conditions that a reasonable person would find intolerable, and further that she acted reasonably in resigning, despite her failure to complain of the harassment or take steps to internally resolve the situation prior to resigning. The evidence adduced at trial supports this finding. For years, Plaintiff suffered daily sexual harassment by Driskill, the top-ranking manager at the warehouse. He harassed her not only at work, but also at home. As the years passed, the harassment became more severe and threatening in nature. In fact, Plaintiff was so intimidated by Driskill that she indicated on the day of her resignation that she did not want to participate in any investigation into the matter out of fear of retaliation by Driskill. Further, a reasonable person confronted with the situation Plaintiff faced at the warehouse would have reason to believe that she had nowhere to turn for help with this situation. First, we note that this case arose in the late 1980's, an era when society was much less cognizant of workplace sexual harassment. Thus, Plaintiff may have been unaware that Defendant had a legal duty to stop Driskill's harassment. Further, Plaintiff asked Driskill, who again was the general manager of the warehouse, to leave her alone on numerous occasions to no avail. There is evidence that Driskill recruited other managers to aid in his stalking of her. When she reported the situation to her union shop steward, he trivialized the situation and told her to "give Driskill a chance." Also, there is evidence that Defendant failed to implement an adequate sexual harassment policy and that few employees were aware of its existence. Given that Defendant failed to make its employees aware it had instituted internal procedures to remedy any complaints of sexual harassment, it should not now complain that Plaintiff failed to take advantage of such procedures. Even if Plaintiff had been aware of Defendant's sexual harassment policy, she might have reasonably concluded that company rules were not enforced against Driskill, given that he often flouted the company rule against drug and alcohol use with impunity.

All of these circumstances, viewed in their totality, support the trial court's finding that Plaintiff was faced with intolerable working conditions and that she acted reasonably in resigning, despite her failure to

complain. Thus, we cannot say the trial court erred in imposing liability on Plaintiff's constructive discharge claim. Point denied.

## C. Strict liability in supervisory sexual harassment claims

■■ Defendant's next two points of error are interrelated. First, Defendant contends that Plaintiff is estopped from seeking damages on her sexual harassment claim, because in neglecting to report the harassment until the day of her resignation, she failed to afford Defendant an opportunity to remedy any harassment. Second, Defendant claims that the trial court erroneously subjected it to strict liability on Plaintiff's sexual harassment claim in accordance with a state regulation. The resolution of both issues turns on whether an employer is strictly liable for supervisory sexual harassment pursuant to that state regulation.

■■ The trial court held Defendant strictly liable for Driskill's sexual harassment of Plaintiff under 8 C.S.R. 60–3.04(17)(c), a state regulation promulgated by the MCHR. Section 8 C.S.R. 60–3.04(17)(c) provides:

"[a]n employer ... is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence."

(emphasis added.) Defendant, relying on *Williamson v. Arvin Industries, Inc.*, 975 F.Supp. 1235 (E.D.Mo.1997), urges us to ignore the strict liability scheme of 8 C.S.R. 60–3.04(17)(c) and instead adopt one of several more employer-friendly standards used by the federal courts. *Wil-*

*liamson* was a case tried in federal court on claims of liability under both Title VII and the MHRA. The *Williamson* court declined to apply 8 C.S.R. 60–3.04(17)(c) with respect to Plaintiff's state law claim in the absence of state cases applying the regulation and because it believed that state regulations are not binding on courts. To the contrary, we believe that state regulations, promulgated pursuant to properly delegated authority, have the force and effect of law and are therefore binding on courts. *See Shepard Well Drilling Co. v. St. Louis County*, 912 S.W.2d 606, 609 (Mo.App. E.D.1995).

Under the federal analysis of administrative regulations, an interpretive regulation is persuasive, but not binding on courts, whereas a legislative regulation is binding. Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.3 (3d. ed.1994). The line of demarcation between the two types is whether the legislature, in its statutory grant of authority, intended the agency to have broad rule-making power. Kenneth Culp Davis, *Administrative Law Text*, § 5.03, p. 128 (3d. ed.1972). Those regulations promulgated pursuant to a statutory grant of authority are considered of the legislative variety, and "[a] court may no more substitute its judgment as to the content of a legislative rule than it may substitute its judgment as to the content of a statute." Davis, p. 126. We see no sound reason to afford the administrative agencies of this State any less deference.

Although the U.S. Supreme Court in a 5–to–4 decision in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) refused to give effect to 29 C.F.R. Section 1604.11(c), an almost identically worded EEOC regulation, that regulation is interpretive rather than legislative.[2] In 42 U.S.C. Section 2000e–12(a),

---

**2.** In two recent cases, the U.S. Supreme Court has altered the position adopted by the *Meritor* majority that employers are not automatically liable for the sexual harassment of their supervisors. In *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Supreme Court has now created a presumption of strict liabil-

Congress gave the EEOC the power to issue procedural rules only. Thus, any substantive rules adopted by the EEOC, such as 29 C.F.R. Section 1604.11(c), are not promulgated pursuant to a statutory grant of authority and are therefore interpretive rather than legislative in nature.

■ In contrast, the MCHR regulation is clearly of the legislative variety. Our state legislature, in the same legislation that created Plaintiff's statutory cause of action, granted the MCHR the broad authority to "adopt, promulgate, amend, and rescind suitable rules and regulations to carry out the provisions of this chapter and the policies and practices of the commission in connection therewith." Section 213.030.1(6). In so doing, the legislature obviously intended that the MCHR have the power to issue legislative regulations that, as discussed above, are binding on courts.

As Defendant has not challenged the procedure used to promulgate 8 C.S.R. 60–3.04(17)(c), nor alleged that it is constitutionally infirm, we are not at liberty to ignore 8 C.S.R. 60–3.04(17)(c) at Defendant's behest. We cannot apply federal standards when the state agency charged with the duty of promulgating regulations to further the goals of the MHRA has adopted a contrary standard.

■ The language of the regulation is unambiguous. Employers are liable for any sexual harassment perpetrated by their supervisors regardless of principles of notice or fault. Because this case involved supervisory sexual harassment, the trial court correctly applied 8 C.S.R. 60–3.04(17)(c) and held Defendant strictly liable regardless of whether it knew or should have known of Driskill's harassment.[3]

Defendant next claims that even if it is strictly liable for the harassing acts of its supervisors, it is entitled to assert various affirmative defenses, namely the estoppel defense outlined in *Torres v. Pisano*, 116 F.3d 625, 631 (2nd Cir.1997) as well as the affirmative defense set forth in *Faragher* and *Burlington*, as there is nothing in 8 C.S.R. 60–3.04(17)(c) prohibiting it from doing so. We conclude that such defenses should not be available in cases involving supervisory sexual harassment.

■ We rely on the same principles of construction when interpreting regulations that we use to interpret statutes. *Trumble v. Director of Revenue*, 985 S.W.2d 815, 819 (Mo.App. E.D.1998). One of the most fundamental principles of statutory construction is that we must give effect to the statute as written and cannot add provisions which do not appear either explicitly or by implication. *Wilson v. McNeal*, 575 S.W.2d 802, 810 (Mo.App. E.D.1978). The MCHR was perfectly capable of setting forth affirmative defenses in the language of 8 C.S.R. 60–3.04(17)(c). Other sections of the MCHR regulations

ity for supervisory acts of sexual harassment, subject to one affirmative defense available only in cases where the harassment has not culminated in a tangible employment action. *Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 441 (2nd Cir. 1999).

3. Defendant urges rejection of strict liability noting that in September 1999, the MCHR, in an appearance before the Joint Committee on Administrative Rules, announced an Emergency Amendment to 8 C.S.R. 60–3.04(17)(c), deleting the strict liability language. However, in adopting this new rule, which instructs the trier of fact to employ federal standards of liability, the Commission has continued to assert before the legislature its authority to

establish principles of liability. The legislature was and is, of course, free to invalidate either regulation pursuant to Section 536.028 RSMo. (Cum.Supp.1998) if the MCHR exceeded its statutorily granted scope of authority. It has not done so. Defendant also proposes retroactive application of the new Emergency Rule. In doing so, it implicitly acknowledges the agency's authority to establish principles of liability governing sexual harassment, but ignores the fact that an agency cannot promulgate in 1999, substantive regulations to govern conduct that occurred in 1989. *See Declue v. Director of Revenue, State of Mo.*, 945 S.W.2d 684, 686 (Mo.App. E.D.1997).

concerning employment discrimination expressly include affirmative defenses. *See, e.g.,* 8 C.S.R. 60–3.02(2) and 8 C.S.R. 60–3.04(16). However, such defenses are conspicuously absent from 8 C.S.R. 60–3.04(c)(17), indicating the MCHR's intent that no affirmative defenses be available in cases of supervisory sexual harassment. Any judicially created affirmative defenses would usurp the legislature's grant of authority to the MCHR to carry out the policies of the MHRA.

Points denied.

## II. PLAINTIFF'S APPEAL

### A. Defendant's Motion to Dismiss Plaintiff's Appeal

At the outset, we address Defendant's Motion to Dismiss Plaintiff's appeal.

First, Defendant argues that Plaintiff's statement of facts violates Rule 84.04(c) in that it misstates facts and omits material facts adverse to Plaintiff. We have carefully reviewed the Statement of Facts contained in Plaintiff's opening brief and find it to be relatively fair and free of argument. We therefore decline to invoke the harsh remedy of striking Plaintiff's brief. *Willis v. Most Worshipful Prince Hall,* 866 S.W.2d 875, 877 (Mo.App. E.D.1993).

■ Next, Defendant argues that Plaintiff fails to mention the standard of review in her brief. However, Plaintiff was not required to state the standard of review at the time she filed her opening brief in November 1998. Rule 84.04(e), which requires the parties to identify the applicable standard of review, went into effect in January 1999, two months after Plaintiff filed her opening brief. Contrary to Defendant's assertion, there was no formal requirement that the parties identify the appropriate standard of review prior to the promulgation of Rule 84.04(e). Although it would have been helpful had Plaintiff provided such information to us, she was not obligated to do so.

Finally, Defendant argues that several of Plaintiff's points relied on violate the "wherein and why" requirement of Rule 84.04(d). We hereby grant Plaintiff's motion to file an amended brief in which she corrects any deficiencies in her Points Relied On. Thus, Defendant's argument is moot.

Defendant's Motion to Dismiss Plaintiff's appeal is denied.

### B. Preemption of Emotional Distress Claim by Workers' Compensation Act

■ We now turn to Plaintiff's assertion that the trial court erroneously struck her claim for emotional distress damages as preempted by the Workers' Compensation Law, Section 287.010, et seq.

■ We must first consider Defendant's claim that Plaintiff failed to properly preserve this issue for our review.[4] Defendant notes that the trial court struck Plaintiff's emotional distress claim from the pleadings in December 1993, a little over two years prior to the date of trial. Defendant contends that because Plaintiff made no attempt to renew her objection to the court's ruling on the motion to strike *at trial,* the claim is not preserved. We disagree.

■ Pretrial rulings striking or dismissing pleadings become appealable when the court enters final judgment in the case, unless certified for immediate appeal, and do not need to be raised at trial to be preserved. Plaintiff was not required to file a motion for new trial to preserve the issue for review because this case was bench-tried. Rule 78.07.

Turning to the merits of Plaintiff's argument, the exclusivity provision of the Workers' Compensation Law provides:

The rights and remedies herein granted to an employee shall exclude all other rights and remedies of the employee... at common law or otherwise, on account of such accidental injury or death, ex-

**4.** Defendant reiterated this argument in its Motion to Dismiss Plaintiff's Appeal.

cept such rights and remedies as are not provided for by this chapter.

Section 287.120.2 (RSMo.Cum.Supp.1992).

 In construing statutes, our goal is to ascertain the intent of the legislature, considering the plain meaning of the words used, and to give effect to that intent if possible. *State ex rel. Baumruk v. Belt*, 964 S.W.2d 443, 446 (Mo. banc 1998). Further, we presume that the legislature was aware of the state of the law at the time of the statute's enactment. *Mills v. Director of Revenue*, 964 S.W.2d 873, 875 (Mo.App. E.D.1998). When two statutes are inconsistent, the later statute operates to repeal the first to the extent of the inconsistency. *Corvera Abatement v. Air Conservation*, 973 S.W.2d 851, 859 (Mo. banc 1998).

The Workers' Compensation Law has long provided remedies for mental conditions suffered while acting within the scope of employment. *Wilhite v. Hurd*, 411 S.W.2d 72, 78 (Mo.1967). The legislature was surely aware of this fact at the time it enacted the MHRA in 1986. It must also have been aware of the fact that the Workers' Compensation Law contained an exclusivity provision. Yet the MHRA specifically provides that victims of discrimination can recover "actual damages." Section 213.111.2 RSMo. (1994). Further, the actual damages recoverable under the MHRA may include awards for emotional distress and humiliation. *Sherer v. Foodmaker, Inc.*, 921 F.Supp. 651, 653 (E.D.Mo.1996). Thus, applying the presumption that the legislature was aware of the state of the law at the time it enacted the MHRA, we conclude that the provision for actual damages in the MHRA was intended to operate as an exception to any contrary provision in the Workers' Compensation Law.

Moreover, the MHRA expressly states that any law inconsistent with it "shall not apply." Section 213.101. The plain and ordinary meaning of these words is that any prior law inconsistent with the provisions of the MHRA does not affect the rights and remedies created by the MHRA.

This idea is further supported by recent case law. Since at least 1992, federal courts have held that the Workers' Compensation Law does not preempt claims of emotional distress under the MHRA. *Varner v. National Super Markets, Inc.*, 94 F.3d 1209, 1212–1213 (8th Cir.1996); *Karcher v. Emerson Elec. Co.*, 94 F.3d 502, 509 (8th Cir.1996); *Gruben v. Famous–Barr Co.*, 823 F.Supp. 664, 667–668 (E.D.Mo.1993); *Sullivan v. Curators of University of Missouri*, 808 F.Supp. 1420, 1422–1423 (E.D.Mo.1992). Our court has also recently endorsed this idea. *See H.S. v. Board of Regents*, 967 S.W.2d 665, 673 (Mo.App. E.D.1998).

Defendant finds significance in the fact that *Varner, Karcher, Gruben* and *Sullivan* were decided after Congress amended Title VII in 1991 to specifically allow victims of discrimination to recover damages for emotional distress. Defendant's argument is not well taken as each of these cases dealt with preemption under the MHRA, not Title VII. Further, the remedy provision of the MHRA is modeled after the remedy provision of the Fair Housing Act, 42 U.S.C. Section 3613(c)(1), rather than that of Title VII. Victims of housing discrimination have always been allowed to recover damages for emotional distress under the remedy provision of the Fair Housing Act, which, like the MHRA, allows the victim to recover "actual damages." *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 236 (8th Cir.1976).

The cases Defendant cites for the proposition that the Workers' Compensation Law preempts claims for emotional distress are inapposite.[5] All of these cases

---

**5.** *Goodrum v. Asplundh Tree Expert Co.*, 824 S.W.2d 6 (Mo. banc 1992); *Killian v. J & J Installers, Inc.*, 802 S.W.2d 158 (Mo. banc 1991); *Hill v. John Chezik Imports*, 797 S.W.2d 528, 531 (Mo.App. E.D.1990); *Hood v. Trans World Airlines, Inc.*, 648 S.W.2d 167

involve common law claims for intentional or negligent infliction of emotional distress rather than claims under the MHRA. Although Missouri courts have held such common law claims to be barred by the exclusivity provision of the Workers' Compensation Law, they have not extended the bar of the exclusivity provision to cases under the MHRA. *Varner*, 94 F.3d at 1212.

Finally, Defendant makes several arguments based on a 1992 amendment to the Workers' Compensation Law that acts to exclude from coverage any mental injuries resulting from "disciplinary action, work evaluation, job transfer, layoff, demotion, termination or any similar action taken in good faith by the employer." Section 287.120. First, based on the concept of *expressio unius exclusio alterus* (the expression of one thing is the exclusion of another), Defendant argues that because the legislature expressly excluded mental injuries resulting from good faith acts, injuries resulting from bad faith acts, such as harassment or discrimination, were intended to remain preempted. In the alternative, Defendant argues that even if we believe Section 287.120 acts to presently exclude claims such as Plaintiff's from coverage under the Workers' Compensation Law, it obviously affected a change in the law in 1992 and that prior to that time, such claims were included within coverage of the Workers' Compensation Law. Thus, Defendant contends that since Plaintiff's claim arose prior to the 1992 change in the Workers' Compensation Law it was preempted at the time it arose.

The flaw in the reasoning of both arguments is that, under our analysis above, the Workers' Compensation Law never preempted claims for mental injuries *under the MHRA*. Thus, Plaintiff's claim for emotional distress damages was never preempted, not even prior to 1992, because it was brought under the MHRA which acts as an exception to the Workers' Com-

pensation Law. The trial court erred in holding otherwise.

■■■ Nonetheless, Defendant contends that such error was harmless, because in any event the trial court made a finding of no causation on this issue. Defendant argues that the trial court's statement that it did not conclude from the testimony of Plaintiff's expert that "the harassment caused the depression [the expert] found [Plaintiff] to be suffering from" is a finding of no causation on the issue of emotional distress. We find this argument untenable. We cannot read a finding on the issue of causation into the trial court's action striking the claim for emotional distress damages as preempted.

The trial court's error in striking Plaintiff's emotional distress claim was clearly prejudicial. Because of this ruling, she was not allowed to present evidence of any emotional distress she suffered except to the extent that such evidence was relevant to whether Plaintiff's work environment was intolerable. The case must be remanded to allow Plaintiff to proceed on her claim for emotional distress damages.

We now turn to the remaining points on appeal, all of which raise various objections to the relief awarded by the trial court.

*C. Effect of Offer of Reinstatement on Back Pay Award*

■■■ First, Plaintiff takes issue with the fact that the trial court barred her from recovering back pay and benefits after the date on which she rejected Defendant's offer of reinstatement.

■■■ In general, a victim of constructive discharge is entitled to back pay from the date of her discharge until the date of final judgment. *EEOC v. Massey Yardley Chrysler*, 117 F.3d 1244, 1251 (11th Cir. 1997). However, where the victim unreasonably rejects an unconditional offer of reinstatement by her former employer, she is barred from recovering back pay from

(Mo.App. E.D.1983); *Russell v. United Parcel Service*, 666 F.2d 1188 (8th Cir.1981); *Harri-*

*son v. Reed Rubber Co., Inc.*, 603 F.Supp. 1456 (E.D.Mo.1984).

the date of the rejection forward, because she has not made reasonable efforts to mitigate her damages. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 238–39, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982).

Plaintiff argues that the trial court erred in finding that Defendant's offer of reinstatement was unconditional and that her rejection of it was unreasonable. First, Plaintiff claims that the two witnesses who testified on Defendant's behalf on this issue gave conflicting accounts of the terms of the offer of reinstatement. According to Plaintiff, although one witness stated that he had made an unconditional offer of reinstatement, the other conditioned the offer upon Plaintiff's signing a release. Further, Plaintiff contends that if there was any valid reason for her to reject Defendant's offer of reinstatement, she was free to do so without a suffering a diminution of her back pay award. She claims that because returning to the warehouse would have exacerbated her post-traumatic stress disorder, and more importantly, would have revealed her whereabouts to Driskill, her rejection of the offer of reinstatement was reasonable.

In making these arguments, Plaintiff essentially asks us to review these questions *de novo*. However, in a bench-tried case, we review the judgment of the trial court only to see if it is supported by substantial evidence. *Murphy v. Carron, supra.*

The trial court determined that Duker's offer to Plaintiff of $10,000, if she would sign a release, or reinstatement to her previous job at the warehouse, was unconditional. The resolution of this issue turned on a conflict between the testimony of Plaintiff and two defense witnesses. Conflicts in evidence are for the trial court to resolve, *Kennedy v. Jasper*, 928 S.W.2d 395, 397 (Mo.App. E.D.1996), and we refuse to disturb this finding on a cold record.

▆ Also, the trial court clearly considered Plaintiff's various explanations for rejecting Defendant's offer of reinstatement

and found them unreasonable. It is the duty of the trial court to weigh the evidence to determine whether a reasonable person would have rejected the offer. *Fiedler v. Indianhead Truck Line, Inc.*, 670 F.2d 806, 808 (8th Cir.1982). The court found that Plaintiff's sole problem was Driskill, and that when he was fired, there was no reason for her not to return to work. There is substantial evidence in the record to support this finding, and we will not disturb it on appeal.

Thus, the trial court correctly limited the award of back pay to the period commencing from the date of Plaintiff's constructive discharge through the date on which Plaintiff rejected Defendant's offer of reinstatement. Point denied.

## D. Prejudgment Interest

▆ Plaintiff next argues that the trial court erred in denying her prejudgment interest. Although the MHRA does not explicitly authorize prejudgment interest, it is modeled after federal anti-discrimination laws, and thus federal law on the issue is strong persuasive authority. *Swyers v. Thermal Science, Inc.*, 887 S.W.2d 655, 656 (Mo.App. E.D.1994). Under federal law, prejudgment interest should ordinarily be granted to victims of unlawful discrimination absent unusual circumstances making the award inequitable. *Booker v. Taylor Milk*, 64 F.3d 860, 868 (3rd Cir.1995); *Sands v. Runyon*, 28 F.3d 1323, 1327 (2nd Cir.1994); *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 841–842 (6th Cir.1994). It is presumptively appropriate when the amount of back pay is readily determinable. *Hutchison v. Amateur Electronic Supply, Inc.*, 42 F.3d 1037, 1046–1047 (7th Cir.1994). The purpose of anti-discrimination laws is to provide "make whole relief," and prejudgment interest is included in this concept. *West Virginia v. United States*, 479 U.S. 305, 310, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987). Prejudgment interest is designed to compensate a plaintiff for the loss of use of her money from the date the cause accrued to

the date of final judgment and to promote settlement, deterring a defendant from unfairly benefiting from the inherent delays of litigation. *Philipp v. ANR Freight System, Inc.*, 61 F.3d 669, 674 (8 th Cir.1995). Although as Defendant correctly notes, the decision to award or deny prejudgment interest is within the discretion of the trial court, it is ordinarily an abuse of discretion not to include prejudgment interest in a back pay award. *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2 nd Cir.1993); *EEOC v. Kentucky State Police Dept.*, 80 F.3d 1086, 1098 (6 th Cir.1996).

Defendant likens this case to *Philipp*, 61 F.3d at 674–675 and *EEOC v. Rath Packing Co.*, 787 F.2d 318, 333–334 (8 th Cir. 1986), two cases in which the Eighth Circuit held that the trial court's denial of prejudgment interest was not an abuse of discretion. However, in both *Philipp* and *EEOC v. Rath Packing*, the trial court entered specific findings that it was denying prejudgment interest because liability was far from clear and the defendant was in a precarious financial position. Here, the trial court did not state its reasons for denying prejudgment interest. Further, contrary to the facts in *Philipp* and *EEOC v. Rath Packing*, Defendant's liability for back pay was clear and the amount would have been simple to determine. In addition, Defendant has not alleged that it is experiencing financial difficulties or that an award of prejudgment interest would place a heavy burden upon it. Under the circumstances, we find that the denial of prejudgment interest was an abuse of discretion. The case is therefore remanded for the calculation of prejudgment interest.

## III. ATTORNEYS' FEES AND COSTS

### A. Attorneys' Fees

 Both parties complain about the trial court's award of attorneys' fees to Plaintiff. The MHRA explicitly authorizes the trial court to award reasonable attorneys' fees to the prevailing party. Section 213.111.2. However, Defendant argues that, in this case, the trial court erred in awarding any fees to Plaintiff's attorney, Michael Hoare, because he was disbarred prior to final resolution of the case. Defendant contends that disbarred attorneys are not entitled to recover fees incurred prior to disbarment.

There are two schools of thought on the issue of a disbarred attorney's entitlement to recover fees for work performed prior to his disbarment. The first theory suggests that when an attorney is disbarred he, through his own misconduct, voluntarily abandons any pending cases and thus should not be allowed to recover for fees incurred prior to disbarment. *See, Kimmie v. Terminal R.R. Ass'n of St. Louis*, 344 Mo. 412, 126 S.W.2d 1197 (1939); *Fletcher v. Krise*, 120 F.2d 809 (D.C.Cir. 1941); *In re Woodworth*, 15 F.Supp. 291 (S.D.N.Y.1936); *Royden v. Ardoin*, 160 Tex. 338, 331 S.W.2d 206 (1960).

The leading Missouri case on this issue, *Kimmie v. Terminal R.R. Ass'n of St. Louis, supra*, adopted this approach. In *Kimmie*, an attorney agreed to represent an injured man in a suit against his employer on a contingent fee basis. The attorney tried the case two times, but each time, the case was reversed and remanded by the Court of Appeals. *Id.* at 1198. During settlement discussions pending the third trial, the attorney was suspended from the practice of law. *Id.* The client retained the services of a new attorney who successfully settled the case. *Id.* The original attorney then made a claim against the settlement proceeds based on contract and quantum meruit theories. *Id.* The court denied recovery on either basis, stating that by virtue of his own misconduct, the attorney could not continue to serve as plaintiff's counsel. *Id.* at 1201. The court considered the attorney's suspension to be a voluntary abandonment of the contract of employment by which he forfeited any right to payment for services rendered previous to disbarment. *Id.*

Only one other case in Missouri appears to have addressed the issue of whether a

disbarred attorney can recover fees. *Sympson v. Rogers*, 406 S.W.2d 26 (Mo. 1966). In *Sympson*, an attorney, in contemplation of disbarment, entered a contract pursuant to which several other attorneys agreed to take over his pending cases. *Id.* at 27. The agreement provided that the successor attorneys would compensate the disbarred attorney for his services in the cases in the amount of 50% of any attorneys' fees obtained. *Id.* However, when the cases settled, the successor attorneys refused to pay the now disbarred attorney his 50% of the fees earned. *Id.* at 28. The disbarred attorney sued to enforce the contract. *Id.* The *Sympson* court distinguished *Kimmie* and refused to apply its rule. The court held that the disbarred attorney could not have abandoned the contract with his successors, because the successors entered into the contract with full knowledge of his impending disbarment. *Id.* at 31. The court enforced the contract between the disbarred attorney and his successors.

Neither *Kimmie* nor *Sympson* dictates the result in this case. Contrary to the facts in *Kimmie*, Hoare seeks to recover from an adverse party, not his own client, and Plaintiff has indeed agreed to his recovery of fees. Contrary to the facts in *Sympson*, Hoare is not seeking to recover from a successor attorney, but again from an adverse party. Thus, the precise issue presented in this case is unanswered in Missouri. Although Missouri courts have not revisited the issue since the *Kimmie* and *Sympson* decisions, another theory as to the recovery of fees by disbarred attorneys has developed in other jurisdictions and was cited with favor by the *Sympson* court.

■ The second theory is that disbarment acts as an automatic termination of employment by operation of law, much like death or disability. Under this theory, an attorney is allowed to recover for the reasonable value of services rendered prior to disbarment so long as he was not disbarred for misconduct associated with the case. *Rutenbeck v. Grossenbach*, 867 P.2d 36 (Colo.App.1993); *Eisenberg v. General Motors Acceptance Corp.*, 761 F.Supp. 20 (E.D.Pa.1991); *Stein v. Shaw*, 6 N.J. 525, 79 A.2d 310 (1951); *Guanil v. Moore-McCormack*, 67 Misc.2d 368, 322 N.Y.S.2d 926 (Sup.1971); *Tiringer v. Grafenecker*, 38 Misc.2d 29, 239 N.Y.S.2d 567 (Sup. 1962). Following this trend, both New York and Illinois have enacted rules specifically authorizing disbarred attorneys to recover for the reasonable value of services rendered prior to their disbarment under a quantum meruit theory. *Mitchell v. B.A.S.F.*, 145 Misc.2d 930, 548 N.Y.S.2d 135 (Sup.1989); *Delbecarro v. Cirignani*, 261 Ill.App.3d 644, 199 Ill.Dec. 185, 633 N.E.2d 981 (1 Dist.1994).

■ We find the second line of cases to be well reasoned. If the rule were otherwise, the imposition of discipline by the state bar would also have the unintended effect of retroactive monetary punishment. "The purpose of disciplinary action is not to punish the attorney, but rather to protect the public." *In re Sabath*, 662 S.W.2d 511, 512 (Mo. banc 1984).

Attorney Hoare does not seek to recover directly from Plaintiff, and his recovery of fees will not diminish any award to Plaintiff. Further, he was disbarred for reasons wholly unrelated to this case. We conclude that in this situation, Plaintiff's attorney is not precluded from recovering attorneys' fees by virtue of his disbarment. Thus, the trial court did not err in awarding attorneys' fees.

■ Next, Plaintiff argues that the trial court erred in limiting the award of attorneys' fees, like that of back pay, to those fees incurred prior to the date on which Plaintiff unreasonably rejected Defendant's offer of reinstatement. We agree. Although as noted above, back pay liability should cease at the time of an unreasonable rejection of an unconditional offer of reinstatement, an award of attorneys' fees should not.

■ In general, counsel for the prevailing plaintiff should be compensated for all time reasonably expended on a matter. *Hensley v. Eckerhart*, 461 U.S. 424, 430, n. 4, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Even if Plaintiff had accepted Defendant's offer of reinstatement, unresolved issues would remain in this case, such as the amount of back pay. Prosecution of such unresolved issues obviously necessitates legal services long after the date on which Plaintiff rejected the offer of reinstatement. Here, Plaintiff's attorney was not compensated for all time reasonably expended in the case. The trial court erred in limiting the attorneys' fee award to the period prior to Plaintiff's rejection of Defendant's offer of reinstatement, and therefore, the case must be remanded for recalculation of reasonable attorneys' fees.

■ Plaintiff also complains that in calculating the attorneys' fee, the trial court used Mr. Hoare's 1989 billing rate, the rate applicable at the time Mr. Hoare rendered the services, rather than the billing rate in effect at the time the trial court rendered judgment. Plaintiff cites to several cases from the federal courts for the proposition that the current rate is to be used. *See, e.g., Missouri v. Jenkins*, 491 U.S. 274, 283–284, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); *Skelton v. General Motors Corp.*, 860 F.2d 250, 255 (7 th Cir. 1988); *Chisholm v. U.S. Postal Service*, 570 F.Supp. 1044, 1046 (W.D.N.C.1983). However, careful review of these cases reveals that they do not create a presumption that an attorney's current hourly rate should be used in all cases, but rather in those cases where the trial court determines that there is a need to compensate the attorney for a delay in payment of fees.

■ The determination of a reasonable attorneys' fee is in the sound discretion of the trial court. *H.S. v. Board of Regents*, 967 S.W.2d at 674, *citing Nelson v. Hotchkiss*, 601 S.W.2d 14, 21 (Mo. banc 1980). We will not reverse the trial court's decision as to the amount of attorneys' fees, "unless the amount awarded is arbitrarily arrived at or is so unreasonable as to indicate indifference and a lack of proper judicial consideration." *H.S. v. Board of Regents*, 967 S.W.2d at 674, *quoting Nelson*, 601 S.W.2d at 21. We find no such abuse of discretion here.

### B. Award of Costs

■ Plaintiff next argues that the trial court erred in taxing one-half of the filing fee and one-half of the cost of depositions to Plaintiff and Defendant. Plaintiff contends that her award was inadequate because it did not reimburse her for all recoverable costs and that the award to Defendant was improper because the action was not frivolous.

With respect to the award of costs to Defendant, Section 213.111.2 provides that "a prevailing respondent may be awarded court costs and reasonable attorneys fees *only upon a showing that the case is without foundation*" (emphasis added). Defendant was not a prevailing party and the case clearly was not "without foundation" because the trial court found in favor of Plaintiff on both of her theories of liability sexual harassment and constructive discharge. Accordingly, the award to Defendant was improper, and we reverse the trial court's judgment to the extent that it attempts to order Plaintiff to bear any of Defendant's deposition expenses.

■ Plaintiff also complains that she was only allowed to recover one-half of the filing fee and one-half of the deposition costs, even though she had provided the trial court with evidence of various other expenses she incurred during the course of this litigation. Plaintiff appears to believe that once she is determined to be the prevailing party and entitled to an award for costs, the trial court must award the total costs of suit. However, Section 213.111.2 provides that the trial court "may award court costs... to the prevailing party." Thus, pursuant to Section 213.111.2, the amount of costs to be award-

ed is within the discretion of the trial court. As we have been given no reason why the award of one-half of the filing fee and deposition costs was an abuse of the trial court's discretion, we affirm that part of the judgment of the trial court awarding costs.

Plaintiff has filed a Verified Motion for Attorneys' Fees for work her counsel has performed in connection with this appeal. Plaintiff has also filed a Verified Motion for Costs seeking reimbursement for expenses associated with this appeal. Given that we are remanding the case for a variety of reasons, including the recalculation of attorneys' fees and costs, it would be premature to grant either of Plaintiff's Motions at this point. *Wentz v. Industrial Automation,* 847 S.W.2d 877, 881 (Mo.App. E.D.1992). However, the award of attorneys' fees and costs on remand should "fully compensate" Plaintiff's counsel for prosecuting this matter to final judgment in accordance with *Hensley,* 461 U.S. at 430, n. 4, 103 S.Ct. 1933. Such an award should obviously include any reasonable hours spent and expenses incurred in connection with this appeal. Thus, Plaintiff's Motions for Attorneys' Fees and Costs on appeal are dismissed as premature.

### SUMMARY

In summary, we affirm the trial court's judgment against Defendant on Plaintiff's claims of constructive discharge and sexual harassment. We also affirm the trial court's judgment awarding attorneys' fees. We remand the case for a recalculation of reasonable attorneys' fees incurred up to the date of final judgment, prejudgment interest and costs in accordance with the principles set forth in this opinion. Further, that part of the trial court's judgment striking Plaintiff's claim for emotional distress is preempted by the Workers Compensation Act is reversed, and the case remanded to allow Plaintiff to proceed with this claim. Plaintiff's Motion to File an Amended Brief is granted. Defendant's Motion to Dismiss Plaintiff's Appeal

is denied. Plaintiff's Motions for Attorneys' Fees and Costs on Appeal are dismissed as premature.

PAUL J. SIMON, P.J., concurs, and KATHIANNE KNAUP CRANE, J., concurs in result.